ALFRED ELA *vs.* LUCIA ELA & others.

Middlesex. December 5, 6, 1892. — January 5, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Equity — Account — Trover — Statute of Limitations — Jurisdiction — Infant — Laches.*

Where a bill in equity for an account states a case disclosing a liability in trover, which is barred by the statute of limitations, this court will not entertain jurisdiction merely on the ground that the property, when converted, belonged to an infant.

BILL IN EQUITY, filed in the Superior Court, on May 12, 1891, against Lucia Ela, Walter Ela, and Richard Ela, alleging the following facts.

Richard Ela, of Washington in the District of Columbia, died in that city on January 8, 1863, intestate, leaving a widow, Lucia, and four children, all minors, namely: Margaret K., born July 29, 1845 ; Walter, born September 23, 1848 ; Richard, born November 30, 1850 ; and Alfred, born October 14, 1857 ; of whom Alfred, the youngest, is the plaintiff in this suit, and the others, excepting Margaret and including Lucia, are defendants. Lucia Ela and Endicott King of Washington were appointed administrators of the estate of Richard Ela, deceased, and duly administered the same and settled their final account. Immediately after the decease of Richard Ela, the family furniture was sold, or removed, and the house vacated by the widow, who removed at once to Topsham, Maine, in which State, on April 4, 1864, she was appointed by the Probate Court guardian of all the children. She never resumed her residence in Washington. Lucia Ela, as guardian, filed an inventory in the Probate Court, charging herself with $13,598.48 for each child, and gave bond, with sureties in the sum of $100,000, but no division of the estate of the deceased was made. The whole thereof remained in the hands and management of King until February, 1872, when the joint fund was surrendered into the hands of the defendant Richard Ela, of Cambridge in this Commonwealth. Three of the children were then of age, and the

transfer of the property from King to Richard Ela was made with the knowledge and consent of Margaret and Walter. Lucia Ela also had knowledge of this transfer, and consented for herself as to the portion of the property which belonged to her, and as guardian as to so much thereof as belonged to Alfred.

About February 13, 1873, a division of the joint fund was made, by which the bonds, stocks, and other property were allotted in severalty to the persons interested, and they were placed in separate envelopes, marked with the names of the several owners, and deposited in a safety vault in Boston. The division was fairly and equitably made, and was ratified and assented to by the three children who had reached majority, and by Lucia Ela for herself and as guardian of Alfred. Thereafter all the funds of the estate were in the hands and management of Richard, except as hereinafter set forth, and were by him very largely lent to and invested in the manufacturing and trading business of one D. G. Pratt, and his successors in that business, and lost. So far as Alfred was interested, the possession and management of these funds by Richard was with the knowledge and consent of Lucia as guardian. Walter was also acquainted with the disposition made of these funds by Richard. In July, 1873, Richard, being about to be absent from the United States for an extended tour in Europe, the possession and management of the funds, with the knowledge and consent of Lucia, devolved upon Walter. While thus in the possession and control of the property of Alfred, assuming to act for Richard, and acting with the knowledge and consent of Lucia, Walter removed from the place of deposit and converted to his own use property of Alfred consisting of bonds of the city of Portland, Maine, to the amount of $2,000, and bonds of the town of Dexter, Maine, to the amount of $4,500, and collected and converted to his own use sundry sums of money paid as interest, dividends, and rents.

The assets of the estate of Richard Ela, deceased, had been for the most part dissipated and lost previously to July, 1876, but of this Alfred remained ignorant. He had acquired the idea that he had inherited from his father's estate about $30,000, and in the belief that this sum, or the income thereof, was

available for his maintenance and education, he went to Germany in July, 1876, and began studying there. He continued there until November of the same year, when Walter sought him out, and, fraudulently concealing that he had converted to his own use property of Alfred, informed him that the property of the family was not sufficient to enable both of them to pursue their studies in Europe, and persuaded him to return to Cambridge. Walter remained in Europe and studied in London, Paris, and Vienna.

D. G. Pratt, above named, was carrying on business in his own name in Cambridge in 1872, and was in embarrassed circumstances. About this time Richard began lending Pratt money at very high rates of interest. Walter also lent Pratt sums of money during the absence of Richard in Europe, in 1873 and 1874. In June, 1874, Walter became a special partner in the business of D. G. Pratt, contributing to the partnership the sum of $15,000, borrowing that sum by pledging certain securities belonging to Alfred, among which were bonds of the city of Portland to the amount of $3,000, and bonds of the city of St. Louis to the amount of $4,000. The special partnership composed of Walter and Pratt was dissolved in December, 1876, and the firm of D. G. Pratt and Company was formed, in which Richard was the "Company." In December, 1877, D. G. Pratt and Company assigned their assets to a trustee for the benefit of creditors, and the trustee permitted Richard to continue to prosecute the business under the name of Richard Ela.

Alfred was desirous of returning to Europe to continue his studies which he had begun there, but Richard informed him that no money was available for that purpose, giving as a reason that all the money of the family had gone into the business then being conducted under the name of Richard Ela, and other enterprises; and Richard stated further, that, if Alfred wished any money for his own purposes, he must engage in business with Richard, that being the only place from which any could be recovered. From that time Alfred assisted his brother to a greater or less extent in the conduct of the business until July, 1879, when, at the instance of Richard, he purchased the assets of the business formerly of D. G. Pratt and Company, and entered into a partnership with Richard under the firm name

of Ela Brothers. During the existence of the firm of Ela Brothers, Alfred made to Walter, who was then in the receipt of a considerable income from his practice as a physician, frequent applications for loans of money to the firm of Ela Brothers. The bill also alleged that Walter, fraudulently concealing and not disclosing to Alfred that he had converted property belonging to him, made it a condition of such loans that Alfred should become personally liable for the same; and that in November, 1882, it appearing that the business of Ela Brothers had not been profitable, and Alfred having expressed his determination to retire from the business, both Richard and Walter required him to execute a release to Lucia Ela, guardian, of all claims against her as such, as a condition precedent to any arrangement to which they would consent for relieving him from the liabilities of Ela Brothers. Such a release Alfred was induced to execute, on the further representation to him made by Richard in the presence and hearing of Walter, which Walter neither denied nor contradicted, that Alfred could not recover any of his property, and that no one was liable for its loss unless it might be Richard. No further explanation than is set forth in this bill was ever given to Alfred concerning the matters and things done by Lucia, Richard, or Walter in the management of the funds derived from the estate of the deceased. Until October, 1889, Richard, who is, and was at the time of the majority of Alfred, a lawyer by profession, was the only adviser of Alfred in family matters, either by relationship or professionally.

In October, 1889, Lucia being extremely ill and not expected to live, a new arrangement with reference to some remnants of the family property was proposed, to which Alfred was not willing to accede; he consulted counsel, and, in consequence of their advice, took possession of certain papers, which he removed from the family residence in Cambridge to Boston. Examination of these papers first disclosed to him that his mother was his guardian by appointment of the Probate Court in Maine, and he immediately began proceedings for a settlement of her account in that jurisdiction. Further examination of these papers, which he continued to make, first disclosed to him, in the spring of 1890, that Walter had made disposition of bonds and moneys

as alleged in this bill. Since the plaintiff came to a knowledge of the conversion of the property by Walter as above set forth, negotiations initiated by the defendants have been pending for an adjustment of the claim herein made. Lucia has never settled her account as guardian, and has never transferred to Alfred, nor expended in his behalf, more than a very small part of the property which came into her hands as his guardian, and for which she became responsible.

The prayer of the bill was for an account; and that it might be decreed that Walter should pay to the plaintiff, without the intervention of the said Richard Ela, Lucia Ela, or the sureties on her bond as guardian of Alfred, the sum found due on accounting; and for other and further relief.

The defendants answered, denying all allegations of fraud or concealment, and demurred separately to the bill, for want of equity. In the Superior Court, the demurrers were sustained, and the bill dismissed; and the plaintiff appealed to this court.

G. D. Williams, for the plaintiff.

A. E. Pillsbury & R. Ela, for the defendants.

HOLMES, J. The allegations of the bill, so far as they concern the only defendant against whom relief is sought, are, that while the plaintiff was a minor and under the guardianship of his mother in Maine, the defendant, his brother, somewhere between July, 1873, and July, 1876, it would seem in 1873 and 1874, being intrusted by the guardian with the possession of property belonging to the plaintiff, converted a part of it to his own use; and that in November, 1882, the plaintiff executed a release to his guardian, being partly induced to do so by a representation, not alleged to have been fraudulent or even false, made by another brother in the said defendant's hearing, and not contradicted by the latter, that no one was liable for the loss of the property except the speaker. The plaintiff came of age on October 14, 1878, but says that he only found out the alleged conversion in 1890.

It will be perceived that a plain case of liability in trover is stated. But no facts are set out to remove the bar of the statute of limitations if the plaintiff had sued at law. We presume it is for this cause and in the hope of finding a more latitudinarian rule in equity that the proceeding is by way of bill, relying upon the old English principle, extended from real

to personal property, that any one who enters upon an infant's property may be made to account. Co. Lit. 89 b, 90 a. *Newburgh* v. *Bickerstaffe,* 1 Vern. 295. *Cary* v. *Bertie*, 2 Vern. 333, 342. *Morgan* v. *Morgan*, 1 Atk. 489. *Dormer* v. *Fortescue*, 3 Atk. 124, 130. *Blomfield* v. *Eyre*, 8 Beav. 250. *Wyllie* v. *Ellice*, 6 Hare, 505. *Quinton* v. *Frith*, 2 Ir. Rep. Eq. 396. *Chaney* v. *Smallwood*, 1 Gill, 367.

Whether this jurisdiction, which was taken under very different circumstances from the present, exists in this Commonwealth, or whether, if it exists, it should be exercised where the relations between the plaintiff and his guardian cannot be settled, are questions upon which we express no opinion. It is enough to say, that it cannot be made use of in the way in which it is sought to be used here, as a mere device to get rid of the statutory limitation in a case which is wholly within the policy of the act. In *Lockey* v. *Lockey,* Prec. Ch. 518, " My Lord Chancellor was clear of opinion, where one receives the profits of an infant's estate, and six years after his coming of age he brings a bill for an account, that the statute of limitations is a bar to such suit, as it would be to an action of account at common law ; for this receipt of the profits of an infant's estate is not such a trust as, being a creature of a court of equity, the statute shall be no bar to, for he might have had his action of account against him at law. . . . If the infant lies by for six years after he comes of age, as he is barred of his action of account at law, so shall he be of his remedy in this court; and there is no sort of difference in reason between the two cases." See Lewin on Trusts, (9th ed.) 1013. *Knox* v. *Gye*, L. R. 5 H. L. 656, 674. Here not only have twice six years elapsed since the plaintiff came of age, but more than six years have passed since he settled with his guardian, and thus was put on inquiry as to what property he was entitled to. The plaintiff shows such laches on the face of his bill that it must be dismissed. See *Fogg* v. *Price*, 145 Mass. 513, 516.

*Bill dismissed.*